**UNITED STATES of America, Plaintiff,**

**v.**

**NEW CASTLE COUNTY, William C. Ward, Stauffer Chemical Company and ICI Americas Inc., Defendants.**

**NEW CASTLE COUNTY, Stauffer Chemical Company and ICI Americas Inc., Defendants/Third–Party Plaintiffs,**

**v.**

**AVON PRODUCTS, INC., NVF Company, The Budd Company, Hercules, Incorporated, Specialty Composites Corporation, Standard Chlorine of Delaware, Inc., Diamond Shamrock, American Hoechst Corporation, E.I. DuPont de Nemours & Co., Motor Wheel Corporation, General Motors Corporation, Chrysler Corporation, Amoco Chemical Corporation, Keysor–Century Corporation, Koppers Company, Inc., Chloramone Corporation, FMC Corporation, Allied Corporation, Westvaco Corporation, Wilmington Chemical Corpora-**

**tion, Gates Engineering, Atlantic Aviation Corporation, Kennecott Corporation, Champlain Cable Corporation, Ametek, Inc., State of Delaware and Harvey & Harvey, Third–Party Defendants.**

**Civ. A. No. 80–489 LON.**

United States District Court, D. Delaware.

June 12, 1991.

Richard G. Andrews, Dept. of Justice, Wilmington, Del. (Andrew Goldman, U.S. E.P.A., Philadelphia, Pa., William A. Hutchins and Nancy Flickinger, Dept. of Justice, Washington, D.C., of counsel), for plaintiff U.S.

B. Wilson Redfearn of Tybout, Redfearn & Pell, Wilmington, Del. (George J. Weiner, Paul M. Honigberg, Patrick O. Cavanaugh and Donavee A. Berger of Schmeltzer, Aptaker & Sheppard, Washington, D.C., of counsel), for defendant/third-party plaintiff New Castle County.

Richard E. Poole and James F. Burnett of Potter Anderson & Corroon, Wilmington, Del., for defendant William C. Ward.

Jeffrey B. Bove of Connolly, Bove, Lodge & Hutz, Wilmington, Del. (John W. Wilmer, Jr. of Vorys, Sater, Seymour & Pease, Washington, D.C., Wendy J. Tish of Stauffer Chemical Co., Westport, Conn. of counsel), for defendant/third-party plaintiff Stauffer Chemical Co.

Joseph C. Kelly and Frederick Moore of ICI Americas, Inc., Wilmington, Del. (Robert Hayes, Denis V. Brenan and Glen R. Stuart of Morgan, Lewis & Bockius, Philadelphia, Pa. of counsel), for defendant/third-party plaintiff ICI Americas Inc.

David R. Hodas, Wilmington, Del. (J. Brian Molloy of Piper & Marbury, Washington D.C., of counsel), for third-party defendant Avon Products, Inc.

James T. McKinstry of Richards, Layton & Finger, Wilmington, Del., for third-party defendants NVF Co., General Motors Corp. and Diamond Shamrock.

J.R. Julian, Wilmington, Del. (Jennifer Berke of Kelly, Harrington, McLaughlin & Foster, Philadelphia, Pa., of counsel), for third-party defendant The Budd Co.

Henry N. Herndon, Jr. of Morris, James, Hitchens & Williams, Wilmington, Del. (Kevin E. Walsh of Hercules Inc., of counsel), for third-party defendant Hercules, Inc.

James F. Bailey, Jr. of James F. Bailey, Jr. & Associates, Wilmington, Del. (Joseph G. Manta, of Manta & Welge, Philadelphia,

Pa., of counsel), for third-party defendant Specialty Composites Corp.

Mark Minuti of Saul, Ewing, Remick & Saul, Wilmington, Del., for third-party defendant Standard Chlorine of Delaware, Inc.

C. Scott Reese of Cooch & Taylor, Wilmington, Del. (Lorelei Joy Borland of Edwards & Angell, New York City, of counsel), for third-party defendant American Hoechst Corp.

Richard Allen Paul and Pamela Meitner of E.I. DuPont de Nemours & Co., Wilmington, Del., for third-party defendant E.I. DuPont de Nemours & Co.

David C. Toomey and Robert F. Stewart, Jr. of Duane, Morris & Heckscher, Philadelphia, Pa., for third-party defendants Motor Wheel Corp. and Allied Corp.

Stephen P. Lamb of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Del., for Wilmington Chemical Corp.

Kurt J. Doelze of Ferri & Doelze, Wilmington, Del. (Charles Kalinoski, Harry A. Short, Jr. of Liebert, Short, Fitzpatrick & Hirschland, Philadelphia, Pa., of counsel), for third-party defendant Chrysler Corp.

Howard M. Berg of Howard M. Berg & Associates, Wilmington, Del. (Ronald J. Ganim of Amoco Corp., Chicago, Ill., of counsel), for third-party defendant Amoco Corporation.

William J. Wier, Jr. of Herlihy & Weir, Wilmington, Del., for third-party defendant Keysor–Century Corp.

John C. Phillips, Jr. of Phillips & Snyder, Wilmington, Del. (Jill M. Blundon of Koppers Co., Inc., Pittsburgh, Pa., of counsel), for third-party defendant Koppers Co., Inc.

John W. Noble of Parkowski, Noble & Guerke, Dover, Del., for third-party defendant Chloramone Corp.

John C. Phillips, Jr. of Phillips & Snyder, Wilmington, Del. (William R. Herman, Bradford Whitman of Dechert Price & Rhoads, Philadelphia, Pa., of counsel), for third-party defendant FMC Corp.

Thomas C. Hughes of Hughes & Sisk, Wilmington, Del. (Brigid E. Kenney of Ven-able, Baetjer & Howard, Baltimore, Md., of counsel), for Westvaco Corp.

James P. Collins of Healy & Collins, Wilmington, Del. (Blake A. Biles of Jones, Day, Reavis & Pogue, Washington, D.C., of counsel), for third-party defendant Gates Engineering.

James T. McKinstry of Richards, Layton & Finger, Wilmington, Del. (Franklin S. Eyster, II of Atlantic Aviation Corp., of counsel), for third-party defendant Atlantic Aviation.

Robert J. Katzenstein of Lassen, Smith, Katzenstein & Furlow, Wilmington, Del. (Stephen W. Miller of Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., of counsel), for third-party defendant Kennecott Corp.

Henry N. Herndon, Jr. and Richard D. Kirk of Morris, James, Hitchens & Williams, Wilmington, Del., for third-party defendants Champlain Cable Corp. and Ametek, Inc.

Robert R. Thompson, Dept. of Justice, Dover, Del., Kevin P. Maloney, Dept. of Justice, Wilmington, Del., for third-party defendant State of Del.

James McC. Geddes of Ashby, McKelvie & Geddes, Wilmington, Del., for third-party defendant Harvey & Harvey.

## OPINION

LONGOBARDI, Chief Judge.

Keysor Century Corporation ("Keysor"), a Third–Party Defendant in this CERCLA action, has moved the Court to reconsider its previous Opinion denying Keysor's motion for summary judgment. New Castle County, Stauffer Chemical Company and ICI Americas, Inc. ("Third–Party Plaintiffs"), Defendants and Third–Party Plaintiffs in the action, oppose a reconsideration of this Court's previous decision.

## PROCEDURAL HISTORY

The United States sued several parties, including the Third–Party Plaintiffs, seeking *inter alia* to recover the costs of cleaning up hazardous wastes which were disposed at the Tybouts Corner Landfill site

("Tybouts Corner" or "the Landfill"). The complaint was filed pursuant to the Comprehensive Environmental Recovery and Response Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675 (1988). The Third–Party Plaintiffs subsequently filed a third-party complaint seeking indemnification and/or contribution from several Third–Party Defendants, including Keysor. After extensive discovery, Keysor filed a motion for summary judgment, Docket Item ("D.I.") 1979, on the ground that there is no evidence in the record showing that Keysor disposed or arranged for the disposal of hazardous wastes at Tybouts Corner.

This Court denied Keysor's motion in a *Memorandum Opinion* dated January 17, 1990. D.I. 2039. Keysor moved this Court to reconsider its decision on the ground that a mistake of fact and/or error of law appeared to be the basis for this Court's decision. D.I. 2041.

After a summary review of the briefs submitted by the parties, the Court concluded that it had misunderstood the artfully worded expert witness affidavits submitted with the initial summary judgment briefs. Following a status conference, this Court ordered the parties to submit letter memoranda on two issues: (1) did the polyvinyl chloride ("PVC") deposited by Keysor contain releasable vinyl chloride monomer ("vinyl chloride" or "VCM"), and (2) is there any evidence which would enable the Court to rule that the oily black stuff allegedly removed from Keysor's premises contained a hazardous substance. D.I. 2045. Keysor and the Third–Party Plaintiffs submitted briefs on these issues and the United States Department of Justice ("DOJ") filed what could be considered an amicus letter on the vinyl chloride issue.

### FACTS

The undisputed facts show that Tybouts Corner is located in New Castle County, Delaware, and was operated as a municipal landfill from January, 1969, through July of 1971. The hazardous substances found at the landfill include vinyl chloride and toluene. During that time period, Keysor operated a plant in Delaware City, Delaware, which manufactured compounded plastic products such as record and bottle compounds. Keysor's plant manager at that time was Mr. Hill. Keysor's current plant manager is Mr. Pierce. Keysor used PVC resin, carbon black pigment, stabilizers, lubricants and toluene to produce its product. PVC was the overwhelming constituent of the plastic products produced by Keysor.

Keysor used approximately six million pounds of PVC resin per year. The PVC resin was purchased in fifty pound bags and in bulk shipments. After the PVC resin was emptied from the paper bags, the paper bags were placed in a dumpster outside of the Keysor plant. Keysor contracted with Mr. Twardus, a refuse collector, to empty the dumpster. Mr. Twardus testified that this refuse was taken to Tybouts Corner. Although they disagree about the amount of PVC resin which reached the Landfill, the parties do not dispute that some PVC resin from the Keysor plant was placed in the Landfill.[1]

The parties' recitation of the facts begins to differ at this point. Mr. Hill explained that Keysor manufactured the plastic product by blending and heating the raw materials in a mixing vessel called an extruder. All of the raw materials were consumed in making the plastic product and any off-specification product was either sold as a low-grade compound or blended back into the product. Mr. Hill and Mr. Pierce testified that the equipment required very little cleaning and any necessary cleaning was accomplished by sending a piece of hard plastic through the screw-feeder of the extruder. They stated that no solvents were

---

**1.** Given Keysor's production figures for the time period the Landfill was in operation, the Third–Party Plaintiffs' expert estimated that between fifteen and seventy tons of PVC material would have been deposited in the Landfill. Keysor questions these figures. There is no *de minimus* defense to liability under CERCLA. *See, e.g., United States v. Wade,* 577 F.Supp. 1326, 1339–41 (E.D.Pa.1983). Therefore, the dispute over the amount of PVC deposited is irrelevant to the Court's analysis.

used in cleaning any of the machines. Mr. Hill and Mr. Pierce testified that the toluene used to make the plastic was purchased in fifty-five gallon drums, the toluene was pumped via a closed system from the drums into the extruder and the empty toluene drums were sent back to the vendor. According to Keysor, no toluene nor any compounded plastic product was placed in the Landfill.

The Third–Party Plaintiffs offered the following evidence to rebut this testimony: James Etzel, Ph.D., an expert in the field of compounding plastic, submitted an affidavit stating that the need to clean or descale the extrusion presses in plants like Keysor's would have required the use of many organic solvents including toluene and would create a "black sort of tar-like liquid." Dr. Etzel also stated that in his opinion Keysor would necessarily discard some PVC resin and some off-specification compounded plastic product. The Third–Party Plaintiffs also offer the testimony of Mr. Twardus who stated that he picked up fifty-five gallon drums of black "light oily stuff" which sometimes smelled like rotten eggs from Keysor's plant and delivered this material to the Landfill. Emanuel Horowitz, Ph.D., an expert in the field of polymer chemistry, has submitted an affidavit which states that if one mixes PVC resin, carbon black wax, lubricant and toluene together, one can obtain a black, oily-like solution.

## ISSUES FOR RECONSIDERATION

1. Does Keysor's disposal of PVC resin in the Landfill create liability under CERCLA because the PVC resin contained trace amounts of unreacted vinyl chloride?

2. If all materially disputed facts are resolved in favor of the Third–Party Plaintiffs, could a reasonable trier of fact find that Keysor disposed of toluene in the Landfill?

**2.** Construing the evidence most favorably to the Third–Party Plaintiffs, the Court notes that Keysor may have deposited two types of PVC product in the landfill—the white PVC powder pur-

## ANALYSIS

This Court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law." Fed.R.Civ.P. 56(c). Where, as here, affidavits and depositions have been submitted by the moving party, the "adverse party must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Those facts which are "material" will be determined from the substantive law to which they are to be applied. *U.S. v. New Castle County,* 727 F.Supp. 854, 860 (D.Del.1989). Furthermore, the Court must consider all inferences favorable to the non-moving party which may be reasonably drawn from the evidence. *Id.* at 861.

In order to prevail on their third-party complaint for contribution, the Third–Party Plaintiffs must prove that: (1) Keysor disposed, or arranged for the disposal, of waste at Tybouts Corner, *see* 42 U.S.C. § 9607(a); (2) the wastes contained "hazardous substances" as defined in section 101(14) of CERCLA; and (3) the hazardous substances contained in Keysor's wastes were found at Tybouts Corner. *United States v. New Castle County,* 642 F.Supp. 1270, 1275 (D.Del.1986). Keysor does not dispute that some of its waste reached the Landfill. Nor does it dispute that vinyl chloride and toluene have been found at Tybouts Corner. Keysor contends that there is insufficient evidence to show that Keysor deposited waste containing either vinyl chloride or toluene in the Landfill.

### 1. *Vinyl Chloride*

The undisputed evidence shows that Keysor did not deposit pure vinyl chloride monomer, a gas at standard temperature and pressure ("STP"), in the Landfill. Keysor does admit it deposited PVC resin in the Landfill.[2] PVC, a polymer made

chased by Keysor to produce its product and the black PVC compounded plastic which Keysor sold. Because neither party has suggested that one resin would be more likely to leach vinyl

from vinyl chloride, is solid at STP. PVC is not a hazardous substance under CERCLA. The question before the Court is whether the PVC resin "contained" vinyl chloride.

The Court has found very little guidance on the meaning of the word "contain." Contain appears to have an obvious meaning. Unfortunately, upon closer inspection this clarity evaporates. For example, Webster's Third New International Dictionary reports at least fifteen variations of the definition of contain. *Webster's Third New International Dictionary* 490–91 (1981). Furthermore, contain is a very imprecise word when applied in the realm of chemistry. Several examples will illustrate this point.

It would not be improper to say that water contains hydrogen. Water is a compound composed of two elements, hydrogen and oxygen and, in certain limited circumstances, water can be broken down into these two components.[3] However, this is very unlikely to occur under normal conditions. Elemental hydrogen is a very flammable, explosive gas. *Merck Index* # 4698 (10th Ed.1983). The hydrogen contained in water does not make water flammable nor explosive. The hydrogen and oxygen in water have undergone a chemical reaction to produce a new material. Because it is very unlikely that water will decompose under normal conditions to produce hydrogen and oxygen, one would not seriously consider regulating water on the ground that water contains hydrogen.

A different type of association exists in mixtures. Mixtures "consist of two or more substances intermingled with ... each component retaining its essential original properties." *CRC Handbook of Chemistry and Physics* F118 (61st Ed. 1980–81). In addition, individual components are easily separated from mixtures. An example of a mixture is lead-based paint. The lead in paint retains its toxicity while suspended in the paint. In addition, because the lead is only tenuously associated with the other components in the paint,

it is likely that the lead would leach from the paint under many conditions.

■ If a chemical reaction would be required to cause a party's non-hazardous waste to generate a hazardous substance, then the likelihood that the reaction could occur at the CERCLA site must be established in order to hold the party liable for disposing of a hazardous substance. For example, in *United States v. Serafini,* 750 F.Supp. 168, 170–71 (M.D.Pa.1990), the City of Scranton sought to hold Capital Records liable for clean-up costs under CERCLA because Capital Records had deposited a PVC compound in a landfill. The City argued that there were fires at the landfill and when the PVC compound was burned under certain conditions it could produce benzene, a hazardous substance found at the landfill. *Id.* Capital Records produced an expert witness affidavit which showed that if the PVC compound were burned under the conditions existing at the landfill, it would be unlikely to produce benzene.

■ When a defendant's waste is a mixture, like lead-based paint, the dissociation of the hazardous substance from the waste can be presumed and the party disposing of the mixture should be held liable under CERCLA for disposing of a hazardous substance. Indeed, courts confronting mixtures containing hazardous substances have held that the mixtures are hazardous substances under CERCLA. *See United States v. Alcan Aluminum Corp.,* 755 F.Supp. 531, 540 (N.D.N.Y.1991) (heavy metals in an oil emulsion are hazardous substances under CERCLA); *United States v. Western Processing Co., Inc.,* 734 F.Supp. 930, 933, 942 (W.D.Wash.1990) (oxazolidone, a thick, viscous liquid, which was tainted with small amounts of arsenic was deemed a hazardous substance by virtue of the arsenic even though pure oxazolidone is not a hazardous substance); *United States of America v. Carolawn Co.,* 21 E.R.C. 2124 (D.S.C.1984) (court held water-based paint wastes were hazardous substances

chloride into the landfill, the Court will not distinguish between these materials.

**3.** For example, the electrolysis of water produces hydrogen gas. *Merck Index* # 4698 (10th Ed.1983).

because they contained toxic pollutants, stating: "To distinguish a waste solution or mixture from its hazardous constituents defies reason.").

Polyvinyl chloride is produced when thousands of vinyl chloride monomers are polymerized or chemically linked together. The parties agree that PVC does not depolymerize or decompose to form vinyl chloride under normal landfill conditions. The parties also agree that when PVC is produced it contains trace amounts of unreacted vinyl chloride monomer. It is this unreacted vinyl chloride that is the subject matter of this dispute.[4] Unreacted vinyl chloride within the PVC matrix is not as tightly bound as the hydrogen in water nor as tenuously bound as the lead in paint. Unreacted vinyl chloride within the PVC matrix may be removed from PVC if the PVC is heated in a vacuum. D.I. 2051, ¶ 3.

This case is unlike *Serafini* because a chemical reaction, such as burning, is not required to remove the unreacted vinyl chloride from PVC. Nor is this case governed by *Western Processing Co.* and *Carolawn* because a passive migration of unreacted vinyl chloride from the solid PVC matrix cannot be presumed. Keysor contends that if the Third–Party Plaintiffs fail to show that the vinyl chloride will migrate from the PVC matrix under landfill conditions, then Keysor is entitled to summary judgment because it did not deposit vinyl chloride in the Landfill. D.I. 2044 at 7. The Third–Party Plaintiffs argue that because Keysor has admitted that PVC contains unreacted vinyl chloride, Keysor is not entitled to summary judgment. D.I. 2046 at 5. In its amicus letter, the DOJ asserts that once it has been established that PVC contains vinyl chloride it is inappropriate to consider whether or not the vinyl chloride will dissociate from the PVC because a plaintiff need not prove that a release of a specific defendant's substance has occurred in order to hold that defendant liable under CERCLA. D.I. 2047 at 7.

■ The analysis required to determine if a waste contains a hazardous substance is distinct from the question of release. The Court understands that a plaintiff need not establish that a given defendant's hazardous substance has been released into a CERCLA site to prove liability. However, the Court believes that if a defendant's waste is a non-hazardous substance, a plaintiff must show that the defendant's waste is *capable* of generating or releasing a hazardous substance at the site in order to show that the defendant's waste "contains" a hazardous substance within the meaning of CERCLA. For the Third–Party Plaintiffs to hold Keysor liable for depositing vinyl chloride on the ground that Keysor deposited PVC resin in the landfill, the Third–Party Plaintiffs must show that it is more probable than not that unreacted vinyl chloride could migrate from the PVC matrix under the conditions existing at Tybouts Corner.

■ Keysor has submitted an affidavit from an expert on polymers, Ronald Salovey, Ph.D. Dr. Salovey stated that unreacted vinyl chloride would be removed from the PVC by the PVC manufacturer prior to its arrival at the Keysor plant. According to Dr. Salovey, the high volatility of vinyl chloride monomer facilitates its removal from PVC long before the PVC would be disposed in a landfill. Dr. Salovey also stated that while unreacted vinyl chloride monomer remaining within the PVC matrix may be removed from PVC if the PVC is heated in a vacuum, there is no evidence that the unreacted vinyl chloride would be likely to dissociate from the PVC under landfill conditions. D.I. 2051, ¶ 3.

To rebut this testimony, the Third–Party Plaintiffs contend that PVC resin used by Keysor was produced prior to the 1975 OSHA regulation of vinyl chloride. Under those circumstances, the manufacturer may not have removed unreacted vinyl chloride from the PVC resin. D.I. 2046 at 2. Dr. Etzel's affidavit contains the following statement: "The presence of trace amounts of unreacted vinyl chloride monomer in PVC before 1975 has been demon-

---

**4.** Indeed it was the wording of the original affidavits that created the uncertainty about whether the unreacted vinyl chloride was part of the matrix of the purchased PVC or was loose, separated and identifiably different from the PVC.

strated." D.I. 2046, ¶ 9. For the purposes of this motion, the Court must assume that the PVC deposited by Keysor contained trace amounts of unreacted vinyl chloride monomer.

The Court concludes that even if the PVC resin deposited by Keysor contained unreacted vinyl chloride, the Third–Party Plaintiffs have not produced any admissible evidence to rebut Dr. Salovey's testimony that the unreacted vinyl chloride monomer would not dissociate from the PVC resin under the conditions at Tybouts Corner. Dr. Horowitz stated in his affidavit that: "In cases where unreacted vinyl chloride monomer remains in the polymer after the polymerization step, so that the vinyl chloride is not bound chemically to the polyvinyl chloride macromolecule, it is possible for the vinyl chloride to migrate and be lost under appropriate conditions." These conditions were not specified. Dr. Horowitz also stated: "Thus, the answer to the question of 'what happens to commercial polyvinyl chloride products or industrial scrap (waste) when it is discarded in a landfill site?' depends both on the chemical composition of the polyvinyl chloride and the conditions which prevail in the landfill (temperature, pressure, water content, oxygen availability, other waste components and their by products, etc.)."

Dr. Etzel's affidavit does not address the critical question of the likely fate of the unreacted VCM in the Landfill. Thus, neither of the Third–Party Plaintiffs' experts made any assessment of the likelihood that any unreacted vinyl chloride in the type of *PVC resin deposited by Keysor* could migrate or dissociate from the PVC *under the conditions that existed at Tybouts Corner.*

Nor have the Third–Party Plaintiffs cited the Court to any studies which show that PVC is more probably than not a source of vinyl chloride found in landfills. An EPA report supplied by the Third–Party Plaintiffs contains the following paragraph:

> The table also reports the presence of vinyl chloride monomer in some of the leachate samples, *the source of which is uncertain.* Some researchers have theorized that biological activity in the landfill can produce vinyl chloride.... Specifically, biochemical anaerobic reactions involving wastes such as lignin from paper can generate vinyl chlorides. Also, PVC manufactured before 1975 could contribute some vinyl chloride monomer to leachate because the less-complete PVC processing techniques employed until that time left some monomer in the materials.... Researchers have also noted that *vinyl chloride appears in leachate from numerous landfills with no apparent correlation with the types of waste disposed....*

D.I. 2046, Exhibit B at 4–28 (emphasis added; citations omitted).

Although the Third–Party Plaintiffs cite a portion of this paragraph in support of their position, the paragraph read as a whole indicates that the authors of the report were speculating about the sources of the PVC vinyl chloride in landfills.

Polyvinyl chloride is a relatively inert solid which is not listed as a hazardous substance. Keysor's expert has stated that it is unlikely that any unreacted vinyl chloride in the PVC deposited by Keysor would migrate from the PVC under the conditions at Tybouts Corner. The Third–Party Plaintiffs' experts and the EPA study do not contain "specific facts" which directly contradict this testimony. The Court finds that the Third–Party Plaintiffs have not produced admissible evidence creating a genuine issue of material fact over whether any unreacted vinyl chloride found in Keysor's PVC could dissociate from the PVC under the Tybouts Corner conditions. The Court holds that the PVC deposited by Keysor did not contain vinyl chloride within the meaning of CERCLA. Therefore, Keysor is granted summary judgment on the vinyl chloride issue.[5]

### 2. *Toluene*

■ It is undisputed that toluene, a hazardous substance under CERCLA, has

---

**5.** The Court notes that the latest affidavits of Dr. Horowitz and Dr. Etzel suggest that other toxic substances might be released from PVC compounds, such as metals, plasticizers, heat stabilizers, modifiers and colorants. This raises a new issue which was not brought before the

been found at Tybouts Corner. The Third–Party Plaintiffs argue that Keysor arranged for disposing drums of an oily black substance in the landfill and this mixture contained toluene.[6] The Third–Party Plaintiffs' expert, Dr. Etzel, has submitted an affidavit which states that plants such as Keysor's must clean their equipment with organic solvents such as toluene. Cleaning the equipment with organic solvents would result in the production of a "black sort of tar-like liquid." D.I. 2049, Addendum B, ¶ 7. There is no evidence to suggest that Keysor ever purchased or used most of the solvents mentioned by Dr. Etzel. However, Keysor admitted purchasing toluene. Mr. Twardus, a waste hauler, has testified that he picked up drums of a black light oily stuff from Keysor's plant and delivered it to Tybouts Corner. A reasonable inference is that the black light oily stuff was generated by Keysor in cleaning its equipment with toluene. Such a liquid mixture is analogous to the water based paint waste in *Carolawn* and this would be a waste containing a hazardous substance under CERCLA.

The Court understands that Keysor denies using toluene or any other organic to clean its equipment. This illustrates the Court's position that there are material issues of fact regarding the methods Keysor used to clean its equipment and whether Keysor's cleaning methods generated a mixture containing toluene which was later deposited at Tybouts Corner. Therefore, Keysor is denied summary judgment on the issue of whether Keysor deposited a waste containing toluene in Tybouts Corner.

Court in the Third–Party Plaintiffs' original reply to Keysor's summary judgment motion. The white PVC resin purchased by Keysor did not contain these components. There is no evidence in the record indicating that the black PVC compound produced by Keysor contained any toxic metals, plasticizers, heat stabilizers, modifiers or colorants. For example, there is no evidence that Keysor purchased any toxic material other than toluene. Therefore, the Court will not delay the resolution of the PVC issue on this ground.

6. The Third–Party Plaintiffs also argue that this mixture contained PVC. Because the Court has already determined the vinyl chloride issue, it will not be addressed again.