**PNEUMO ABEX CORPORATION, et al., Plaintiffs,**

v.

**BESSEMER AND LAKE ERIE RAILROAD COMPANY, INC., et al., Defendants.**

**Civil Action No. 2:94cv716.**

United States District Court, E.D. Virginia, Norfolk Division.

March 25, 1996.

### MEMORANDUM OPINION AND ORDER

JACKSON, District Judge.

#### INTRODUCTION

Plaintiffs initiated this action pursuant to sections 107 and 113 of the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9607, 9613 (1988 & Supp.1993), as amended by the Superfund Amendments and Reauthorization Act of 1986 ("CERCLA" or "the Act"), and the Declaratory Judgment Act, 28 U.S.C. § 2201(a) (1994). Plaintiffs seek recovery of costs allegedly incurred in responding to releases or threatened releases of allegedly hazardous substances at or from the Pneumo Abex Superfund Site ("Site").

In Conference Order No. 2, filed October 23, 1995, the Court recognized voluntary party organizations. These groups were the Railroad Defendants, the Landowner Defendants, the Miscellaneous Defendants, and the Remaining Defendants (those Defendants not in a group). Since the filing of the order, some of the parties have changed groups. The Court will recognize Defendant Cambria and Indiana Railroad Company as a member of the Railroad Defendants,[1] and the Court now will recognize Defendant Trian Group, Limited Partnership as a member of the

---

1. Montour Railroad Company and Norfolk and Portsmouth Belt Line Railroad are no longer a part of the Railroad Defendants.

Miscellaneous Defendants. Therefore, there are no more Remaining Defendants. Also, on November 21, 1995, the Court dismissed, without prejudice, Railroad Defendant Florida East Coast Industries.

The Court ordered that the parties file all motions to dismiss and for summary judgment by January 8, 1996.[2] The Railroad Defendants filed a motion for summary judgment on January 9, 1996 on the issue of their liability under § 107(a)(3) of CERCLA.[3] On January 9, 1996, Defendant Richmond, Fredericksburg & Potomac Railroad Company ("RF & P") filed a motion for partial summary judgment on the issue of whether Plaintiffs may recover under § 107(a) or are limited to an action for contribution under § 113(f).[4] On January 30, 1996, Defendant RF & P supplemented its brief in support of the motion. The Court also considered the facts and arguments in this supplemental correspondence. On January 9, 1996, Defendants Bessemer and Lake Erie Railroad Company, The Lake Terminal Railroad Company, and Union Railroad Company, Inc. filed a motion for partial summary judgment regarding the liability of Plaintiffs Pneumo Abex Corporation, the City of Portsmouth, and the Portsmouth Redevelopment and Housing Authority pursuant to § 107(a). Pneumo Abex Corporation and Whitman Corporation[5] filed a motion for summary judgment on January 11, 1996 on the liability of the Railroad Defendants,[6] Consolidated Rail Company, Greenlease Holding Company, and Trian Group, Limited Partnership[7] under § 107(a). The Court has received responses from all parties. The matters are now ripe for judicial determination.

For the reasons that follow, the Court **GRANTS** Plaintiffs' motion for summary judgment against the Railroad Defendants remaining in this litigation and Consolidated Rail Corporation. Furthermore, the Court **DENIES** the Railroad Defendants' motion for summary judgment and Richmond, Fredericksburg & Potomac Railroad Company's motion for partial summary judgment.

## I. FACTUAL BACKGROUND

From 1927 to 1978, the predecessors of Plaintiff Pneumo Abex Corporation ("Abex") operated a railroad parts foundry in Portsmouth, Virginia. Railroad companies sold used scrap journal bearings[8] and other scrap metal railcar and engine parts to the foundry. Abex alleges that Defendants or their corporate predecessors are all former customers of the foundry. Railroad companies accumulate the journal bearings which they have taken out of service and then sell them to foundries such as Abex. The foundry processed the parts and produced new parts for the railroads. The Association of American Railroads ("AAR") established specifications for journal bearings. Railroad inspec-

2. The Court briefly extended this deadline because of inclement weather at the beginning of the year along the East Coast of the United States.

3. The Miscellaneous Defendants joined this motion.

4. Bessemer and Lake Erie Railroad Company, The Lake Terminal Railroad Company, Norfolk Southern Railway Company, Norfolk and Western Railway Company, Union Railroad Company, Inc., and the Miscellaneous Defendants joined this motion. Florida East Coast Railway Company and Highpoint, Thomasville & Denton Railroad Company filed similar motions and adopted RF & P's brief.

5. In this opinion, the term "Plaintiffs" refers only to Pneumo Abex Corporation and Whitman Corporation unless otherwise indicated.

6. Plaintiffs do not seek summary judgment against USX Corporation, Montour Railroad Company, and Norfolk and Portsmouth Belt Line

Railroad. On March 5, 1996, Plaintiffs and USX Corporation filed a joint motion for the Court to accept a settlement between these parties. Montour Railroad Company and Norfolk and Portsmouth Belt Line Railroad are not Defendants in the Second Amended Complaint, but the Court listed them as Railroad Defendants.

7. In Plaintiffs' motion for summary judgment regarding liability under § 107 of CERCLA, Plaintiffs refer to all these defendants collectively as the Railroad Defendants, although the appellation is inaccurate for the Court's purposes.

8. A journal bearing is a metal part designed to hold oil against railroad car axles for lubrication and consists of two parts, a back and a babbitt. The back contains tin, lead, zinc, copper, nickel and antimony. The babbitt is the soft metal lining, composed of mostly lead, that makes direct contact with the axle. The babbitt wears down over time as a result of friction.

tors determine when railroad companies need to replace journal bearings because they are broken or worn.

To produce new parts for its customers, Abex placed the broken or worn journal bearings into a pot or furnace and heated them to remove any remaining portions of the lead linings, dirt, and grease. Abex next placed the bearings in a furnace to melt them down for re-casting. Abex added tin, lead, zinc, and copper to the molten scrap to comply with the AAR's specifications. Both of these furnaces were vented to the outside. (Pls.' Mem. at 6–7.) This process produced emissions of fine particulate material. (Record of Decision Amendment, prepared by the United States Environmental Protection Agency ("EPA"), August 1994 [hereinafter "ROD Amend."] at 12.) Abex poured the molten material into sand molds to form the backs of journal bearings. After the backs hardened and Abex machined them, Abex lined the backs with the scrap lining metal (babbitts) that it had separated from the scrap journal bearings initially. (Pls.' Mem. at 7.) Abex reused the sand until the sand lost its capacity to form molds. After washing the sand to reclaim bits of brass, Abex placed the sand on the back lot of its property. (*Id.*)

According to the "Memorandum in Support of the Motion of Plaintiffs Pneumo Abex Corporation and Whitman Corporation for Summary Judgment" ("Plaintiffs' Memorandum"), the EPA began testing the soil at the Site in the mid–1980s and found that it contained elevated levels of the metals contained in journal bearings. More specifically, the EPA found lead, copper, zinc, nickel, tin and antimony. (Pls.' Mem. at 11.) In 1986 and 1992, the EPA ordered removal of soil from the Site pursuant to § 106 of CERCLA; Plaintiffs Pneumo Abex and Whitman incurred the removal costs. The EPA notified several of the Railroad Defendants and Plaintiffs that they were potentially responsible parties under § 107(a) and invited them to negotiate a consent degree. (Pls.' Mem. at 12, Ex. 18.) Only Plaintiffs negotiated a decree, and the United States and Plaintiffs lodged the Consent Decree with this Court on January 4, 1996.

The Consent Decree provides that Abex will finance and perform all of the work at the Site with the exception of a few tasks to be performed by Plaintiffs, the City of Portsmouth (the "City") and the Portsmouth Redevelopment and Housing Authority (the "PRHA"). (Consent Decree at 13, 18.) The work that Abex will perform/supervise and finance is essentially all the remedial work at the Site. In their respective areas of competency, the City and the PRHA, *inter alia*, will assist Abex administratively in the remediation, rezone the area surrounding the Site from residential to commercial or light industrial, purchase or acquire through condemnation some residences, and build a permanent City facility in the area. (*Id.* at 18–20.) Within thirty (30) days of lodging the Consent Decree, Abex agrees to "establish and maintain financial security in the amount of $20,000,000 (the approximate current estimated cost of the remedy) in the form of a Letter of Credit." (*Id.* at 48.) Within thirty (30) days of the effective date of the decree, Pneumo Abex agrees to reimburse the United States for past response costs in the amount of $1,170,131.37. (*Id.* at 55.) Abex also agrees to reimburse the United States for all future response costs not inconsistent with the National Contingency Plan. (*Id.*)

## II. LEGAL STANDARD

Summary judgment is appropriate when the court determines that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). Once a party has properly filed evidence supporting the motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c), the burden shifts to the nonmoving party to set forth specific facts showing genuine issues for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *accord Sylvia Dev. Corp. v. Calvert County, Md.*, 48 F.3d 810, 817 (4th Cir.1995). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552. The court must view the record as a whole and in the light most favorable to the nonmoving party. *Terry's Floor Fashions, Inc. v. Burlington Industries, Inc.*, 763 F.2d 604, 610 (4th Cir.1985). It must draw any permissible inference from the underlying facts. *Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir.1992), *cert. denied*, 507 U.S. 918, 113 S.Ct. 1276, 122 L.Ed.2d 671 (1993). However, it need consider only reasonable inferences from the evidence. *Thompson Everett, Inc. v. Nat'l Cable Advertising, L.P.*, 57 F.3d 1317, (4th Cir.1995) (citing *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir.), *cert. denied*, 358 U.S. 908, 79 S.Ct. 234, 3 L.Ed.2d 229 (1958)).

## III. DISCUSSION

The motions for summary judgment essentially raise two issues. First, Plaintiffs and Defendants move for summary judgment on the issue of whether Defendants are liable as arrangers, often also known as generators, of the disposal or treatment of hazardous substances under § 107(a)(3). The second issue, which Defendants raise, is whether Plaintiffs, as potentially responsible parties ("PRPs"), may maintain an action for recovery under § 107(a) or whether they are limited to an action for contribution under § 113(f).

■ To establish a prima facie case for cost recovery under CERCLA, Plaintiffs must prove the following four elements:

(1) that the site in question is a "facility" as defined in 42 U.S.C. § 9601(9); (2) that the defendant is a responsible person under § 9607(a); (3) that the release or threatened release of a hazardous substance has occurred; and (4) that the release or threatened release has caused the plaintiff to incur response costs.

*Chesapeake & Potomac Tele. Co. v. Peck Iron & Metal Co.*, 814 F.Supp. 1269, 1274 (E.D.Va.1992) (citing *Ascon Properties, Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1152–53 (9th Cir.1989)). Defendants have not challenged the existence of three of the essential elements for recovery of costs under CERCLA. All parties agree that the Site is a "facility" as defined in § 101(9) of CERCLA, that the release or threatened release of hazardous substances has occurred, and that Plaintiffs have incurred response costs. However, most of the motions for summary judgment debate the second element, which requires Plaintiffs to prove that Defendants are responsible persons under § 107(a) of CERCLA. Plaintiffs allege that the Railroad Defendants and others are liable as arrangers of the disposal or treatment of hazardous substances, namely, worn journal bearings and castings.

### A. *Defendants'. Liability as Arrangers/Generators*

■ Section 107 of CERCLA establishes strict liability for arrangers of the disposal or treatment of hazardous substances. *United States v. Monsanto Co.*, 858 F.2d 160, 166–67 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989). Subsections 107(a)(3) and (4) of CERCLA provide in relevant part as follows:

any person who by contract, agreement, or otherwise arranged for the disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, . . .

. . . shall be liable for—

all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; [and]

any other necessary costs of response incurred by any other person consistent with the national contingency plan. . . .

CERCLA §§ 107(a)(3), (4)(A), (4)(B), 42 U.S.C. §§ 9607(a)(3), (4)(A), (4)(B) (1988 & Supp.1993). The Railroad Defendants contend they are not liable under § 107 for three reasons. First, they argue that did not arrange for "disposal or treatment" of worn journal bearings and castings. Second, they argue that the worn bearings and castings were "useful products" and thus could not serve as the basis of liability under

CERCLA. Lastly, they argue that the worn bearings and castings were not "hazardous substances." The Court views these three reasons, however, as one basic argument about the nature of the transactions between the Railroad Defendants and Abex. Essentially the Railroad Defendants are arguing that they sold useful products to Abex and thus the bearings and castings should not be deemed "hazardous substances." The Railroad Defendants similarly argue that the sale properly may not be characterized as "disposal or treatment" because they sold useful, raw materials to Abex for use in its manufacturing process. The Court addresses these arguments in the reverse order from the order presented by the Railroad Defendants, and, as the Court explains below, it finds this reasoning unpersuasive.

### 1. Hazardous Substances

■ The Court first determines whether the worn journal bearings and castings were hazardous substances. CERCLA defines "hazardous substance" to include, *inter alia,* "any element, compound, mixture, solution, or substance designated pursuant to section 9602 [CERCLA § 102] of this title." CERCLA § 101(14)(B). Section 102 of CERCLA provides that the Administrator of the EPA shall promulgate regulations designating hazardous substances, and these designations are listed in a table in Title 40, Section 302.4 of the Code of Federal Regulations. The journal bearings that the Railroad Defendants allegedly sold[9] to Abex contained the following substances: tin, lead, zinc, copper, nickel and antimony. (RR Defs.' Br. at 6–7.) Lead, copper, zinc, and antimony are listed as hazardous substances in 40 C.F.R. § 302.4 (1995). Thus Plaintiffs argue that because the journal bearings contained these hazardous substances, the journal bearings themselves were hazardous substances within the meaning of sections 102 and 107 of CERCLA. The Railroad Defendants urge the Court to reject Plaintiffs' theory that a substance is hazardous because it *contains* hazardous substances. Plaintiffs and the Railroad Defendants cite several cases in support of their respective positions; however, none of them are directly on point. The United States Court of Appeals for the Fourth Circuit has not addressed this issue.

The Railroad Defendants cite *B.F. Goodrich Co. v. Murtha,* 840 F.Supp. 180 (D.Conn. 1993), in support of their position that the journal bearings were not hazardous substances. In that case, the court found that the defendant who disposed of scrap tires was not liable under CERCLA because "[n]othing offered shows that HS [hazardous substances] in tires contributes to the conditions at either site which give rise to CERCLA liability." *Id.* at 186. The Fourth Circuit has addressed this prong of the Railroad Defendants' argument, which is one essentially of causation. The language of the § 107(a)(3) "does not mean that the plaintiff must trace ownership of each generic chemical compound found at a site. Absent proof that a generator defendant's specific waste remained at a facility at the time of release, a showing of a chemical similarity between hazardous substances is sufficient." *Monsanto Co.,* 858 F.2d at 169. Although the court in *B.F. Goodrich Co.* granted another defendant's motion for summary judgment, this case does not directly advance the Railroad Defendants' position. In granting that motion for summary judgment, the court did not address whether the substance in question was a hazardous substance, because there was a lack of proof that the substance even contained any hazardous substances. *See B.F. Goodrich Co.,* 840 F.Supp. at 187–89. Thus the court did not have before it a case such as the instant one, in which substances, namely, journal bearings, that contain hazardous substances, contributed to the contamination at the Site.

The Railroad Defendants also cite *United States v. New Castle County,* 769 F.Supp. 591 (D.Del.1991), in support of their position. In that case the court held the following:

[I]f a defendant's waste is a non-hazardous substance, a plaintiff must show that the

---

9. As the Court discusses below, only Miscellaneous Defendants Greenlease Holding Company and Trian Group, Limited Partnership resisted Plaintiffs' motion for summary judgment by asserting the existence of a genuine issue of material fact concerning whether they sold scrap materials to the Site.

defendant's waste is capable of generating or releasing a hazardous substance at the site in order to show that the defendant's waste "contains" a hazardous substance within the meaning of CERCLA.

*Id.* at 597. The court further explained that in order for the plaintiffs to prevail, they must show that it was more probable than not that the hazardous substance migrated from the "non-hazardous substance" [10] *under the conditions existing at the site. Id.* For the court, the question was not whether a substance was hazardous by virtue of containing hazardous substances. Instead the court employed the "likelihood of release" test, by determining whether a party could be held liable without proof that those constituent parts could have contributed to the contamination at the site under the known conditions. *See id.* at 598 (finding that even if the non-hazardous substance contained a hazardous substance, plaintiffs did not prove that under the conditions at the site, the hazardous substance would dissociate from the non-hazardous substance). By contrast, in the case *sub justice,* the Railroad Defendants have not contested Plaintiffs' allegations that the constituent parts of the bearings contributed to the contamination of the site in the instant case. The Railroad Defendants imply that Pneumo Abex has supplied inconsistent answers to questions concerning the processes which led to the contamination of the site. (RR Defs.' Br. at 10–11). However, the Railroad Defendants do not challenge Plaintiffs' allegations that the hazardous substances contained in the journal bearings were part of these processes, which lead to the contamination. (*See id.* at 11 ("[A]ny releases from the Foundry came from Abex's manufacturing processes and not from the worn bearing or castings before their use in these processes.").) Plaintiffs merely must show that "a generator defendant's waste was shipped to a site and that hazardous substances similar to those

contained in defendant's waste remained present at the time of the release." *Monsanto Co.,* 858 F.2d at 169 n. 15. With the aid of the Record of Decision Amendment prepared by the EPA, Plaintiffs have made this showing. Accordingly, the Court finds the worn journal bearings and castings were hazardous substances for the purpose of determining liability under CERCLA.

### 2. Useful Products

The Railroad Defendants further argue that the worn journal bearings and castings were not hazardous substances because they were "useful products." The Railroad Defendants cite *Douglas County v. Gould, Inc.,* 871 F.Supp. 1242 (D.Neb.1994), in support of their position. The defendant in that case operated a spent lead acid battery reclamation facility. He removed lead plates from spent batteries and sold the lead plates to one of the former owners of the contaminated site which used the lead plates in its secondary smelting operation. The plaintiff, the current owner of the site, sued the defendant because he allegedly arranged for the disposal of the lead plates. The court in *Douglas County* framed the issue as whether

> the sale of lead plates by a party *whose business it is to reclaim them from batteries,* constitutes an "arrangement for disposal" under CERCLA.... [A]n arrangement for disposal occurs when a party merely wants to get rid of a substance as opposed to convey a useful product.

*Douglas County,* 871 F.Supp. at 1246 (emphasis added). The court distinguished between the potential liability of a seller of whole spent batteries and a seller of reclaimed lead from such batteries. *Id.* at 1247 (discussing *Catellus Dev. Corp. v. United States,* 34 F.3d 748 (9th Cir.1994)). The court stated, in dicta, that "[h]ad ... [the defendant's] reclamation site been contaminated, no doubt the battery suppliers would have been liable." *Id.* at 1247.

**10.** The court in *New Castle County* used the term "non-hazardous substance," and this Court uses the term in its discussion of the case for consistency. The term, however, carries a perhaps inadvertent legal conclusion. The substance in the case is non-hazardous in the sense that it is not designated by name by any of the sources

enumerated in CERCLA § 101(14). Yet the actual question before this Court is whether a substance which contains a material that the statute designates as hazardous converts that "non-hazardous substance" into a hazardous one for the purpose of determining liability under CERCLA.

In the instant case, the Railroad Defendants and others were not sellers of reclaimed material; they were not in the business of selling worn journal bearings and castings, unlike the defendant in *Gould* who was in the business of selling reclaimed lead plates. The Railroad Defendants and other Defendants are more closely likened to the battery suppliers in *Douglas County*. The Railroad Defendants and others perhaps were fortunate to find a buyer for the bearings and castings after they no longer could be used in the capacity for which they had been manufactured. Yet the facts demonstrate the Railroad Defendants' and others' primary objective was "to get rid of a substance[, namely, the worn parts] as opposed to convey a useful product." *Id.* at 1246. The Court recognizes that other district courts have addressed this issue and come to slightly different conclusions. *See, e.g., United States v. Petersen Sand & Gravel, Inc.,* 806 F.Supp. 1346, 1353–55 (N.D.Ill.1992) (finding defendants not liable who sold fly ash, a byproduct of coal combustion, "for valuable consideration for the purpose of manufacturing road base, and for manufacturing road base alone"). This Court does not find that these decisions effectuate CERCLA's goals in aggressively addressing the release or threatened release of hazardous substances.

In evaluating this argument, the Court finds instructive the case of *Chesapeake & Potomac Tele. Co. v. Peck Iron & Metal Co.,* 814 F.Supp. 1269, 1274 (E.D.Va.1992), where the court analyzed the argument regarding the sale of spent lead acid batteries. The defendants in that case contended that they sold raw materials for use in another company's manufacturing process and thus properly could not be characterized as having arranged for disposal of hazardous substances. In rejecting this argument the court remarked,

> If the defendants had sold unused, and still usable, batteries to an entity which used them in their business and then drained battery acid and lead from them—causing damage to the environment—their argument would be meritorious. But the only remaining "use" of the batteries sold by the generator/recycler defendants ... was

that lead, a hazardous substance, could be reclaimed from them. As batteries, per se, they had no use.

*Id.* at 1275. In the instant case, the Railroad Defendants and others sold worn journal bearings and castings, not new ones. Their only remaining use was to serve as a part of a process which led to environmental damage. Thus, the Court finds that the "useful product" argument in this case lacks merit.

### 3. Disposal or Treatment

■ Finally, the Court determines whether the sale of the worn journal bearings and castings was an arrangement for disposal or treatment within the meaning of CERCLA. Plaintiffs contend that the sale of the worn parts was an arrangement for both disposal and treatment. Under § 101(29) of CERCLA, "disposal" and "treatment" have the meanings provided for in § 1004 of the Solid Waste Disposal Act ("SWDA"), 42 U.S.C. § 6903 (1988), as amended by the Resource Conservation and Recovery Act of 1976 ("RCRA"). The SWDA defines "treatment" when used in connection with "hazardous waste" as the following:

> any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amendable [sic] for recovery, amendable for storage, or reduced in volume.

SWDA § 1004(34). In this instance, the Court finds that the sale and subsequent processing of the worn bearings fall within the definition of treatment "so as to render such waste ... reduced in volume." The Railroad Defendants and others sold worn journal bearings and castings to Abex after these Defendants could no longer use the materials for the purposes for which they were intended. Abex cleaned these materials, melted them down, added various metals, and poured the molten material into sand molds to create new journal bearings. The sand molds eventually became laden with heavy metals such, as lead, antimony, copper, tin, and zinc. (ROD Amend. at 12.) After

the sand molds lost their capacity to serve as molds, Abex disposed of the sand on the back lot of the Site. (Pls.' Mem. at 7–8.) Thus, the processing at the Site reduced the waste in volume from whole, worn bearings and castings to residual amounts of the constituent elements. *Cf. United States v. Pesses,* 794 F.Supp. 151, 157 (W.D.Pa.1992) (finding that processing of scrap materials to make alloys by melting, shearing, cleaning, crushing, sawing, and other means constituted treatment under CERCLA).

Alternatively, the Railroad Defendants and others arranged for treatment that rendered the constituent elements of the worn journal bearings amenable for recovery. Abex removed the lining from the backs, removed dirt and grease, melted the backs, added tin, lead, copper, and zinc to the molten material, and poured the molten material into molds to make new bearings. This process constituted treatment within the meaning of CERCLA. *See, e.g., Ekotek Site PRP Comm. v. Self,* 881 F.Supp. 1516, 1528 (D.Utah 1995) (finding process where used oil was heated, mixed with sulfuric acid, and blended with various additives as treatment which rendered waste amenable for recovery); *Pesses,* 794 F.Supp. at 157.

■ The Railroad Defendants and others argue that the importation of the term "treatment" from the Solid Waste Disposal Act necessarily also imports the concept of "hazardous waste." They further argue that because § 1004(5) of the SWDA defines "hazardous waste" as "a solid waste or combination of solid wastes," the Court must find that the hazardous substance was a solid waste to hold them liable for the arrangement of treatment of a hazardous substance. The Court, however, does not find this argument compelling nor consistent with the language of CERCLA. "The drafters of CERCLA appear to have referred to sections 6903(3) and 6903(34) of the SWDA only to define the actions of 'disposal' and 'treatment,' not to define the objects of those actions, the materials to be disposed of or treated." *California v. Summer Del Caribe, Inc.,* 821 F.Supp. 574, 579 (N.D.Cal.1993) (citation omitted). If the Court were to adopt the Railroad Defendants' statutory interpretation, there would exist no plausible reason to use the term "hazardous substance" in § 107 of CERCLA when Congress already had defined the term "hazardous waste" in the SWDA and opted to import several definitions from the SWDA into CERCLA.

> If the court were to accept defendant's definition of "disposal", however, there could be no "disposal of à hazardous substance" since the definition of "disposal" would be at odds with the definition of "hazardous substances". Sections of the CERCLA statute regarding the disposal of hazardous substances, therefore, would have to be either ignored or read to mean only disposal of hazardous wastes.

*CP Holdings, Inc. v. Goldberg–Zoino & Assocs.,* 769 F.Supp. 432, 437 (D.N.H.1991). Congress easily could have imported the definition of "hazardous waste" into CERCLA. Congress did not, however, and the Court must assume that Congress meant to describe two different concepts or bases for liability by its use of two different terms: hazardous wastes and hazardous substances. *Compare Summer Del Caribe,* 821 F.Supp. at 579 ("Given the distinct purposes of the acts [the SWDA, preventive and CERCLA, curative], it follows that they cover different materials.") (citing *B.F. Goodrich Co. v. Murtha,* 958 F.2d 1192, 1202 (2d Cir.1992) *with Moore v. Harris,* 623 F.2d 908, 914 (4th Cir.1980)) ("The rebuttal presumption of formal consistency states that use of different language creates the inference that Congress meant different things.... However, where the statutory purpose and legislative history establish that no difference was in fact intended, the presumption is rebutted.")

■ Alternatively, the Court also finds that the Railroad Defendants and others arranged for the disposal of hazardous substances. The SWDA defines "disposal," in connection with "hazardous waste," as the following:

> the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted

into the air or discharged into any waters, including ground waters.

SWDA § 1004(3). By selling the worn parts to Abex, the Railroad Defendants and others arranged for their ultimate disposal, either through the emission of particulate matter from the furnaces at the foundry or by dumping, on the back lot of the Site, the sand once used as molds. *Cf. Chesapeake & Potomac Tele. Co.*, 814 F.Supp. at 1275 ("[T]he generator/recycler defendants made the decision to sell spent lead acid batteries to . . . a facility that contains lead. Thus, they arranged for the treatment and disposal of the lead, and fall well within the ambit of Section 107(a)."). Although the Railroad Defendants and others may not have played a direct role in transporting the worn parts or in the process that lead to the ultimate disposal, they made the "crucial decision" to sell the worn parts to a facility that processed hazardous substances. *See, e.g., Chatham Steel Corp. v. Brown*, 858 F.Supp. 1130, 1142–43 (N.D.Fla.1994) (citing *United States v. A & F Materials*, 582 F.Supp. 842 (S.D.Ill.1984)); *Allied Towing v. Great Eastern Petroleum Corp.*, 642 F.Supp. 1339, 1350 (E.D.Va.1986) (same). Accordingly, the Court finds that the Railroad Defendants remaining in the case and Consolidated Rail Corporation arranged for the disposal of hazardous substances by selling worn journal bearings and castings to Abex.

The Court has found that the worn journal bearings and castings were hazardous substances and not useful products. Furthermore, the Court has determined that the Railroad Defendants and others arranged for the disposal and treatment of these hazardous substances. With the exception of Defendants Greenlease Holding Company and Trian Group, Limited Partnership, whom the Court discusses below, no Defendant against whom Plaintiffs seek summary judgment has set forth "specific facts showing genuine issues for trial" concerning whether they are responsible persons under § 107(a). Thus, the Court finds as a matter of law that the Railroad Defendants who remain party to

this litigation and Consolidated Rail Corporation are responsible persons under § 107(a) of CERCLA and thus are liable for costs of response incurred by Plaintiffs. Accordingly, the Court **GRANTS** Plaintiffs' motion for summary judgment against these Defendants.

### B. *PRPs' Recovery of Costs under § 107 versus § 113*

■ The second major issue presented by the motions for summary judgment is whether Plaintiffs as PRPs can maintain a suit for cost recovery under § 107(a)(4)(B) of CERCLA or whether their cost recovery action must be brought under § 113(f)(1). Defendant Richmond, Fredericksburg & Potomac Railroad Company ("RF & P") made a motion for partial summary judgment on this issue.[11] Defendant RF & P argues that determination of this issue is important "because it affects the nature of liability that may be imposed, the burden of proof, and statute of limitations that apply." (RF & P's Br. at 1.) Following its examination of the Consent Decree in this case, RF & P supplemented its brief with a letter to the Court to argue that "[t]he 'contribution protection' provided by the decree will work a grave injustice on the defendants *if* you allow the plaintiffs to obtain a joint and several judgment for all costs under CERCLA § 107." (RF & P's Let. at 1–2.) Beyond these issues, the Court recognizes that Defendants fear that Plaintiffs will experience a windfall if allowed to recover all costs, including its proportional share, under § 107.

The United States Court of Appeals for the Fourth Circuit has not addressed whether a PRP can maintain an action under § 107 *and* section 113 of CERCLA. RF & P argues that prior to the enactment of § 113(f) courts recognized an implied right of contribution under § 107, but in enacting § 113(f), Congress demonstrated its intent that the new section provide the only basis of cost recovery for PRPs. In support of their interpretation of the statute, RF & P argues

11. The Miscellaneous Defendants, Bessemer and Lake Erie Railroad Company, Inc., Florida East Coast Railway Company, High Point, Thomasville, and Denton Railroad Company, Norfolk Southern Railway Company, Norfolk & Western Railway Company, The Lake Terminal Rail Company, and Union Railroad Company, Inc. joined RF & P's motion for partial summary judgment.

that all six United States Courts of Appeals that have considered the issue have determined that PRPs are limited to actions for contribution under § 113.[12] (RF & P's Br. at 16–17.) RF & P also argues that the majority of United States District Courts have held the same. (RF & P's Br. at 19–20.) However, the Court does not find that the weight of authority is as great as RF & P concludes. For example, in *Amoco Oil Co. v. Borden, Inc.*, the court proceeded under § 113 but did not expressly rule out the possibility of a PRP proceeding under § 107. 889 F.2d 664 (5th Cir.1989). Nothing in the decision indicates that either party raised the issue. *Cf. Dant & Russell, Inc. v. Burlington N. R.R. (In re Dant & Russell, Inc.)*, 951 F.2d 246 (9th Cir.1991). Examining the other four opinions which RF & P cites, the Court does not find their reasoning persuasive.

Furthermore, the United States Supreme Court casts doubt upon the conclusion that PRPs may not recover under § 107. In *Key Tronic Corp. v. United States*, the Supreme Court deciding the issue of whether attorney's fees were recoverable costs, stated that "the statute [CERCLA] now expressly authorizes a cause of action for contribution in § 113 and impliedly authorizes a similar and somewhat overlapping remedy in § 107." — U.S. ——, —— – ——, 114 S.Ct. 1960, 1965–66, 128 L.Ed.2d 797 (1994).

Nothing on the face of the statute indicates that an arranger/generator is liable under § 107 *only* to the United States, a state, an Indian tribe, or any other "innocent person." The statute specifically provides that an arranger/generator is liable to *any other person* who has incurred any other necessary costs of response, consistent with the national contingency plan. CERCLA § 107(a)(4)(B).

Again, the Court finds *Chesapeake & Potomac Tele. Co. v. Peck Iron & Metal Co.*, 814 F.Supp. 1269, 1277 (E.D.Va.1992), instructive. In that case the district court found that nothing in the statute precluded a PRP

from initiating cleanup and suing to recover its costs under § 107. In addressing the concerns of the defendants in that case that the plaintiff would be able to benefit unjustly, the court reassured the defendants that because it would retain jurisdiction over the case throughout the contribution phase, it would ensure equitable apportionment.

> [T]he Court addresses this concern not by ignoring the plain language of CERCLA and precluding C & P [the plaintiff, PRP] from maintaining its cost recovery action, but by imposing joint and several liability on the defendants only for those response costs that are apportioned to the defendants, as a group, in this case—exclusive of the costs attributable to C & P. At the contribution phase of this proceeding, the Court will, as a first cut at apportioning liability, determine a "Plaintiff's share" and a "Defendants' share."

*Id.* at 1277–78. This Court agrees in large part with the court's interpretation of the statute in *Chesapeake and Potomac Tele. Co.*

■ The Court concludes that it is appropriate to permit Plaintiffs to seek recovery under § 107. However, the Court likewise finds it appropriate to require Plaintiffs to pay its equitable portion of the cleanup costs. In allowing Plaintiffs to proceed under § 107 in this case, the Court is able to accomplish several of the statute's goals at once. First, the Court preserves the statute's incentives for PRPs to settle and settle early. In settling with the United States through the Consent Decree, Plaintiffs have avoided the costs of litigation with the Government. Furthermore, in allowing Plaintiffs to proceed under § 107, Defendants are faced with joint and several liability if the Court determines that the harm is indivisible. *United States v. Monsanto Co.*, 858 F.2d 160, 171 (4th Cir.1988), *cert. denied*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989) (citing *New York v. Shore Realty*, 759 F.2d 1032, 1042 n. 13 (2d Cir.1985); *United States v.*

---

**12.** *Control Data Corp. v. S.C.S.C. Corp.*, 53 F.3d 930 (8th Cir.1995); *United States v. Colorado & E.R.R.*, 50 F.3d 1530 (10th Cir.1995); *United Technologies Corp. v. Browning–Ferris Indus.*, 33 F.3d 96 (1st Cir.1994), *cert. denied*, — U.S. ——, 115 S.Ct. 1176, 130 L.Ed.2d 1128 (1995); *Akzo*

*Coatings, Inc. v. Aigner Corp.*, 30 F.3d 761 (7th Cir.1994); *Dant & Russell, Inc. v. Burlington N. R.R. (In re Dant & Russell, Inc.)*, 951 F.2d 246 (9th Cir.1991); *Amoco Oil Co. v. Borden, Inc.*, 889 F.2d 664 (5th Cir.1989).

*Chem–Dyne,* 572 F.Supp. 802, 810–11 (S.D.Ohio 1983)). The burden rests with Defendants to prove that the harm is divisible and to provide the Court with a rationale for apportionment. *Compare id.* at 172 (citing *Chem–Dyne,* 572 F.Supp. at 810) *with* CERCLA § 113(f) (which the Railroad Defendants suggest should place the burden of proof upon Plaintiffs as parties seeking contribution) *and United States v. Colorado & E. R.R.,* 50 F.3d 1530, 1526 (10th Cir.1995) (citations omitted). The Court in the instant case will apportion liability by first determining "Plaintiffs' share." Although the Court will not allow Plaintiffs to recover the entire cost of cleanup, Plaintiffs' share will not include any "orphan shares." For the purposes of this opinion, an orphan share is defined as any portion of liability that is not attributable to Plaintiffs or an available PRP. A PRP is unavailable if it is not present in the litigation for whatever reason. The Court also deems any PRP that is insolvent as being unavailable, despite being a party to this litigation. Consequently, Defendants are liable for any orphan shares.

For the foregoing reasons, the Court **DENIES** Richmond, Fredericksburg & Potomac Railroad Company's motion for partial summary judgment, which seeks to limit Plaintiffs to an action for contribution under § 113(f)(1) of CERCLA.

Having determined that Plaintiffs may proceed under § 107(a), the Court finds that Plaintiffs' claims under § 113(f)(1) (Count II) are no longer necessary. Accordingly, the Court **DISMISSES** Plaintiffs' claims pursuant to § 113(f)(1) of CERCLA.

**C.** *The Motion for Partial Summary Judgment by Defendants Bessemer and Lake Erie Railroad Company, The Lake Terminal Railroad Company, and Union Railroad Company, Inc.—Plaintiffs' Liability under § 107*

Defendants Bessemer and Lake Erie Railroad Company, The Lake Terminal Railroad Company, and Union Railroad Company, Inc. move this Court pursuant to Rule 56(c) of the Federal Rules of Civil Procedure to find

Plaintiffs Pneumo Abex Corporation, the City of Portsmouth, Virginia, and the Portsmouth Redevelopment and Housing Authority liable under § 107(a) of CERCLA.[13] In view of the Court's decision to require Plaintiffs to pay an equitable portion of the clean-up costs, it is not necessary to address this motion for partial summary judgment.

**D.** *Greenlease Holding Company's Opposition to Plaintiffs' Motion for Summary Judgment*

On January 22, 1996, Greenlease Holding Company ("Greenlease") submitted a memorandum in opposition to Plaintiffs' motion for summary judgment to find the Railroad Defendants and the Miscellaneous Defendants liable under § 107(a) of CERCLA. In addition to joining the arguments set out in the Railroad Defendants' motion for summary judgment, Greenlease argues that "there is no evidence in the record to support the plaintiff's bold assertion that Greenlease was a customer of the Foundry...." (Greenlease Mem. at 4.) Greenlease cites the deposition of Mr. Elmer Oakes, who was employed at the foundry for approximately twenty-two (22) years. The quoted passages indicate that Mr. Oakes knew that Greenlease was a customer of one of the plants *but not a customer of the plant in Portsmouth.* (*Id.* at 3–4 (citing Oakes Dep. at 552).) In its memorandum, Greenlease states that "Greenville Steel Car Company is the predecessor in interest to Greenlease for purposes of this litigation." (*Id.* at 3 n. 2). Greenlease also argues that it was "unable to discern a single document referring to Greenville." (*Id.* at 4 n. 3.) The Court's review of Exhibit 8 of Plaintiffs' Memorandum found a "Record of Metal Received" which names Greenville Steel Car Company as the originator of the metal. (Pls.' Ex. 8.) Thus, Greenville appears to be a customer who sold worn bearings to Abex. Greenlease further argues, however, that at most, such documentation would "create a genuine issue of material fact when contrasted with Mr. Oakes' testimony." (Greenlease Mem. at 4 n. 3.) Although Mr. Oakes testi-

13. The Miscellaneous Defendants joined this motion.

fied at his deposition that the records in Exhibit 8 were the records of the Portsmouth facility (Oakes Dep. at 589–90), his earlier testimony contradicts the inference to be drawn that the record concerning Greenlease means that Greenlease sent scrap materials to the Site. Thus, there remains a genuine issue of material fact concerning whether Greenlease is a PRP. Accordingly, the Court **DENIES** Plaintiffs' motion for summary judgment against Greenlease Holding Company.

### E. *Trian Group, Limited Partnership's Opposition to Plaintiffs' Motion for Summary Judgment*

On January 22, 1996, Trian Group, Limited Partnership ("Trian") filed a memorandum in opposition to Plaintiffs' motion for summary judgment. Trian is a successor in interest to Central Railroad Company of New Jersey ("Central Railroad"). Trian argues that the Court should not grant summary judgment against it because of the existence of "a factual question as to whether Central Railroad actually sent used journal bearings to the Portsmouth Foundry." (Trian Mem. at 3.) In other words, Trian disputes that it is a PRP.

Trian cites the testimony of Mr. Oakes at his deposition which may indicate that in 1961 Central Railroad sent its scrap journal bearings to Abex's Meadville Pennsylvania foundry and not the Portsmouth foundry. (*Id.* at 4–6 (citing Oakes Dep. at 105–106, 216–221, 563 and referring to Railroad Defendants' Ex. 6).) Mr. Oakes testified that Central Railroad was one of the Meadville foundry's customers at that time. (Oakes Dep. at 217.) Later in the deposition, Mr. Oakes testified that he remembered that the Portsmouth foundry received scrap journal bearings from Central Railroad, probably during the 1960s or 1970s. (Oakes Dep. at 415–16.) Exhibit 8 also includes documents which indicate that in 1967 Abex received scrap journal bearings from Central Railroad, but the records do not indicate which facility received the scrap. (Pls.' Ex. 8.)

Just as with Greenlease Holding Company, the Court is unable to conclude on the record before it that no genuine of issue of material fact exists concerning whether Trian is a PRP. Consequently, the Court **DENIES** Plaintiffs' motion for summary judgment against Trian Group, Limited Partnership.

### CONCLUSION

The Court finds that the Railroad Defendants remaining in the litigation and Consolidated Rail Corporation are arrangers of the disposal and treatment of hazardous substances for which Plaintiffs have incurred response costs at the Site. Thus, these defendants are liable to Plaintiffs under § 107(a) of CERCLA. For the foregoing reasons, the Court **GRANTS** Plaintiffs' motion for summary judgment against the above-named Defendants but **DENIES** Plaintiffs' motion for summary judgment against Greenlease Holding Company and Trian Group, Limited Partnership. The Court **DENIES** the Railroad Defendants' motion for summary judgment. The Court also **DENIES** Richmond, Fredericksburg & Potomac Railroad Company's motion for partial summary judgment. The Court **DEFERS** ruling upon the motion for partial summary judgment of Bessemer and Lake Erie Railroad Company, The Lake Terminal Railroad Company, and the Union Railroad Company, Inc. The Court also **DISMISSES** Count II of Plaintiffs' complaint, which seeks recovery under § 113(f)(1) of CERCLA.

It is so **ORDERED.**